1

2

3

4

5

6

7

8

9                          UNITED STATES DISTRICT COURT

10                         EASTERN DISTRICT OF CALIFORNIA

11

| | |
|---|---|
| 12  RAMIRO HUERTA, | Case No. 1:17-cv-01446-EPG |
| 13                      Plaintiff, | ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' |
| 14            v. | MOTION FOR SUMMARY JUDGMENT |
| 15  COUNTY OF TULARE, *et al.*, | (ECF No. 152). |
| 16                      Defendants. | |
| 17 | |
| 18 | |

19          This civil rights case arises from an encounter between Plaintiff Ramiro Huerta

20  ("Plaintiff") and Tulare County Sheriff's Department deputies. Plaintiff brings federal and state

21  law claims against the Tulare County Sheriff's Department ("TCSD"), as well as the involved

22  TCSD deputies, Ronald Smith, Michael Coldren, James Dillon, Salvador Ceja, Hector

23  Hernandez, Laura Torres-Salcido, and Does 1-50[1]. Defendants move for summary judgment on

24  all claims. For the reasons that follow, the Court grants in part and denies in part Defendants'

25  motion.[2]

26  _____

[1] Doe Defendants 1-50 remain unnamed. The Court will issue a separate order regarding the Doe
27  defendants.

[2] The parties have consented to entry of final judgment by the United States Magistrate Judge under the
28  provisions of 28 U.S.C. § 636(c) with any appeal to the Court of Appeals for the Ninth Circuit. (ECF No.

**PROCEDURAL BACKGROUND**

Plaintiff initiated this case on October 25, 2017. (ECF No. 1). Plaintiff's Second Amended Complaint alleges eleven causes of action against the County of Tulare[3], TCSD, the involved TCSD deputies, and Does 1-50: 1) battery; 2) assault; 3) false imprisonment; 4) intentional infliction of emotional distress; 5) violation of civil rights pursuant to 42 U.S.C. § 1983; 6) violation of civil rights under *Monell v. New York City Dept. of Soc. Services*, 436 U.S. 658 (1978); 7) violation of California's Bane Act; 8) violation of California's Unruh Act; 9) negligent hiring and supervision against the County of Tulare, TCSD, and Does 7-50 only; 10) negligent training against the County of Tulare, TCSD, and Does 7-50 only; and 11) violation of the First Amendment. (ECF No. 22).

On June 15, 2023, Defendants moved for summary judgment. (ECF No. 152). Plaintiff filed his opposition on July 14, 2023. (ECF Nos. 155, 156). Defendants filed a reply on July 28, 2023. (ECF No. 157). The Court held a hearing on Defendants' motion on August 11, 2023. (ECF No. 158).

In his opposition, Plaintiff withdraws his *Monell*, Unruh Act, and First Amendment claims. (ECF No. 156, p. 6 n.1). At the hearing, Plaintiff also conceded that Plaintiff's claims against Deputy Torres-Salcido should not proceed. Accordingly, Defendants' motion for summary judgment is granted as to Plaintiff's sixth, eighth, and eleventh causes of action, as well as all claims as alleged against Deputy Torres-Salcido.

**FACTUAL BACKGROUND**

Unless otherwise indicated, the facts set forth in this section are drawn from facts asserted by Defendants in their statement of the undisputed facts that are explicitly undisputed by Plaintiff.[4] Plaintiff also submitted an additional statement of undisputed material facts to which

---

50).

[3] Plaintiff's claims against the County of Tulare have been dismissed pursuant to the parties' stipulation. (ECF Nos. 164, 165).

[4] "DSUF" refers to Defendant's Statement of Undisputed Fact. (ECF No. 152-1). "PSUF" refers to Plaintiff's Response to Defendants' Statement of Undisputed Fact. (ECF No. 156-3). "DSUF Reply" refers to Defendants' Reply to Plaintiff's Response to Defendants' Statement of Undisputed Fact. (ECF No. 157-3).

Defendants responded.[5]

**Plaintiff Calls the Porterville Police Department**

On April 25, 2017, sometime after 9:30 p.m., Plaintiff called the Porterville Police Department ("PPD") multiple times to complain that someone was flashing their lights outside of the residence where Plaintiff lived with his parents. (DSUF Nos. 1-2). Plaintiff was informed that his residence was outside PPD's jurisdiction. (DSUF No. 3). Plaintiff used explicit language during these calls and was told to stop calling. (DSUF No. 6). PPD called TCSD to perform a welfare check on Plaintiff because Plaintiff had called PPD numerous times. (DSUF No. 7). PPD informed Plaintiff that TCSD was on their way to speak with Plaintiff in person. (DSUF No. 8). At around 10:00 or 10:30 p.m., Plaintiff stopped calling and went to sleep. (DSUF No. 9).

**TCSD Deputies Arrive at Plaintiff's Residence**

At approximately 10:30 p.m., multiple TCSD deputies, including Deputies Coldren, Dillon, Ceja, Hernandez, and Sergeant Smith, responded to the service call. (DSUF No. 10). Sergeant Smith made the decision to send two units to respond. (DSUF No. 11). Sergeant Smith was also in charge of the service call. (DSUF No. 14). The deputies were advised that there was a "super upset" subject, possibly under the influence of alcohol and drugs, who had called PPD multiple times, and that deputies were dispatched to perform a welfare check and evaluate Plaintiff for being under the influence of a controlled substance (an "11-5"). (DSUF No. 13; PSUF No. 13 (citing Def. Ex. P, Phone 6 Sgt. Briefed of Request at 00:38); DSUF Reply No. 13).

Upon arrival, the deputies viewed the overgrown yard of the residence as a safety risk, so some deputies waited by the gate at the fence of the residence to keep a lookout. (DSUF No. 16). Deputy Dillon knocked on the front door of the residence and identified himself as "Sheriff's Department." (DSUF No. 17). After the deputies rang the doorbell, Plaintiff came to the door and spoke with the deputies but would not tell the deputies his name. (DSUF Nos. 18, 19). Deputy Dillion also asked Plaintiff to step out of his residence, but Plaintiff did not do so. (DSUF No. 20).

//

---

[5] "PSAF" refers to Plaintiff's Statement of Additional Disputed Fact. (ECF No. 156-4). "DSAF" refers to Defendants' Response to Plaintiff's Statement of Additional Disputed Fact. (ECF No. 157-1).

**TCSD Deputies Speak with Plaintiff and Plaintiff's Parents**

Plaintiff's mother, Josefina Huerta, woke up because she heard banging on the door. (DSUF No. 21). When Ms. Huerta approached the door, she realized that multiple police officers were outside the residence. (DSUF No. 22). At the door, Plaintiff and Ms. Huerta spoke with each other in Spanish. (DSUF No. 23). The deputies asked the Huertas to open the door. (DSUF No. 25).

Deputy Coldren instructed the other deputies to back up so that the door could swing open and that, if the door opened up, they would "take [Plaintiff] out." (DSUF No. 28). One of the deputies told dispatch that they were contacting a male who was uncooperative and that an elderly woman was inside as well. (DSUF No. 29). Ms. Huerta proceeded to tell the deputies (in Spanish) that the family would deal with the issue tomorrow, and that Plaintiff was drunk. (DSUF No. 30).

While some of the deputies continued to speak with Plaintiff, Deputies Coldren and Ceja went to look for another way into the residence in order to take Plaintiff into custody. (DSUF No. 32). Mr. Huerta, Plaintiff's father, came to the door and told Plaintiff (in Spanish) to shut his mouth, multiple times. (DSUF No. 33). Plaintiff's parents attempted to calm Plaintiff down and move him away from the door. (DSUF No. 34). Throughout the encounter, Plaintiff and the deputies exchanged heated words.[6]

At some point, Plaintiff also told the deputies that he was on, and had bought, opiates.[7] (DSUF No. 35). Defendants assert that the deputies believed, based on Plaintiff's behavior, that Plaintiff was intoxicated. (DSUF No. 27). While Plaintiff disputes that the deputies' actually believed Plaintiff was intoxicated, (PSUF No. 27), Plaintiff does not dispute that he told the deputies that he was on opiates and that Ms. Huerta told the deputies that Plaintiff was drunk (PSUF Nos. 30, 35).

**Sergeant Smith Develops a Plan to Detain Plaintiff**

After multiple unsuccessful attempts to get Plaintiff to willingly exit the residence,

---

[6] The parties do not dispute that Plaintiff and the deputies exchanged heated words, including insults and curses during the incident. (DSUF Reply Nos. 26, 31). Defendants also assert, and Plaintiff does not specifically dispute, that Plaintiff used racial epithets during the encounter. (DSUF No. 31; PSUF No. 31).

[7] The parties do not dispute that Plaintiff had taken Klonopin, which he had been prescribed, prior to the use of force incident. (DSUF No. 9; PSUF No. 9; DSUF Reply No. 9).

Sergeant Smith developed a plan to draw Plaintiff out. (DSUF Nos. 36, 37). Sergeant Smith's plan was to have Deputy Coldren wait behind a bush while Sergeant Smith told the other deputies to leave to see if Plaintiff would come out further from the residence. (DSUF Nos. 39, 40).

### Deputy Dillon and Deputy Hernandez Turn off their Body Worn Cameras

The deputies, except for Sergeant Smith and Deputy Coldren, began to leave . (DSUF No. 40). Deputies Dillon and Hernandez turned off their body worn cameras. (*Id.*; DSUF Nos. 42-44). Sergeant Smith and Deputy Ceja were not wearing body worn cameras during the service call. (DSUF Nos. 43, 44).

The parties dispute whether Sergeant Smith instructed Deputies Coldren, Dillon, and Hernandez to turn off their body worn cameras or whether Deputies Dillon and Hernandez turned off their cameras because they believed the encounter had ended. (DSUF Nos. 40, 41; PSUF Nos. 40, 41). According to Defendants, Deputy Coldren did not turn off his body worn camera, but his cord was broken during the altercation with Plaintiff, which rendered the camera inoperable. (DSUF No. 42). Plaintiff disputes that Deputy Coldren's camera cord broke and asserts that Deputy Coldren's body camera was intentionally turned off prior to the incident. (PSUF No. 42).

### Plaintiff's Detention

After the deputies appeared to leave, Plaintiff exited the residence, coming out into the yard to put a lock on the property gate. (DSUF No. 45). As planned by Sergeant Smith, Deputy Coldren stood by the house near some bushes to detain Plaintiff. (DSUF No. 46).

The parties have different accounts of the ensuing altercation between Plaintiff and Deputies Coldren, Dillon, Hernandez, and Ceja, including whether Plaintiff resisted. However, it is undisputed that Plaintiff somehow ended up on the floor of the threshold inside the residence. (DSUF No. 48; PSUF No. 48). It is undisputed that the deputies used fist-strikes to Plaintiff's face, baton strikes to his thigh, and flashlight strikes to his leg. (DSUF No. 52; PSUF No. 52). It is also undisputed that Sergeant Smith did not physically participate in the altercation. (DSUF No. 53; PSUF No. 43).

After Plaintiff was handcuffed, Deputy Dillon and Deputy Coldren moved to put Plaintiff into a patrol car. (DSUF No. 55). The parties dispute whether Plaintiff resisted as he was moved into the patrol car. (DSUF No. 56; PSUF No. 56). It is undisputed that Deputy Coldren assisted

Deputy Dillon in pepper spaying Plaintiff's face outside of the patrol car. (DSUF No. 56). It is also undisputed that Deputy Dillon used a soft hobble to restrain Plaintiff's lower legs. (DSUF No. 57).

Plaintiff was driven to the hospital by Deputies Coldren and Dillon so that he could be medically cleared before taken to jail. (DSUF No. 58, 59, 62). After Plaintiff was medically cleared, Plaintiff was transported to jail for booking. (DSUF No. 62). Plaintiff was released from jail on April 26, 2017. (PSAF No. 18).

## SUMMARY JUDGMENT

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. At summary judgment, the court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The Court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence. *See id.* at 255; *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *Liberty Lobby, Inc.*, 477 U.S. at 249-50. A fact is material if its proof or disproof is essential to an element of a plaintiff's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby, Inc.*, 477 U.S. at 248. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted).

The moving party bears the initial burden of informing the Court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact for trial. *Celotex*, 477 U.S. at 323. If the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, set forth specific facts showing that there is some genuine issue for trial in order to defeat the motion. *See* Fed. R. Civ. P. 56(c); *Liberty Lobby, Inc.*, 477 U.S. at

250.

# FEDERAL CLAIMS

The Court now turns to Defendants' motion for summary judgment, starting with arguments regarding Plaintiff's federal claims.

## I.    EXCESSIVE FORCE

Defendants move for summary judgment on the basis that Deputies Coldren, Dillon, Ceja, and Hernandez did not use excessive force against Plaintiff in violation of Plaintiff's Fourth Amendment rights and are entitled to qualified immunity.[8]

### A.    Excessive Force Legal Standards

The Fourth Amendment requires law enforcement officers making an arrest to use only an amount of force that is objectively reasonable in light of the circumstances facing them. *Graham v. Connor*, 490 U.S. 386, 397 (1989). That assessment "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. To determine whether a specific use of force was reasonable, the Court must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing government interests at stake." *Id.* at 396; *Blankenhorn v. City of Orange*, 485 F.3d 463, 477 (9th Cir. 2007).

The first step of the excessive force analysis evaluates the severity of the intrusion on the individual's Fourth Amendment rights by assessing "the quantum of force used[.]" *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005); *Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994) ("The three factors articulated in *Graham,* and other factors bearing on the reasonableness of a particular application of force, are not to be considered in a vacuum but only in relation to the amount of force used to effect a particular seizure[.]"). Non-lethal force "is not synonymous with non-excessive." *Bryan v. MacPherson*, 630 F.3d 805, 825 (9th Cir. 2010). "[A]ll force—lethal and non-lethal—must be justified by the need for the specific level of force employed." *Id.* For example, "[a] blast of pepper spray and blows from a baton are not necessarily constitutionally

---

[8] Plaintiff also asserts his fifth cause of action for violation of civil rights against TCSD. As Plaintiff has withdrawn his *Monell* claim against TCSD, and because a municipal entity "cannot be held liable under § 1983 on a *respondeat superior* theory," *Monell*, 436 U.S. at 691, the Court grants summary judgment in favor of TCSD as to Plaintiff's Section 1983 claims.

equivalent levels of force simply because both are classified as non-lethal." *Id.* Courts "must evaluate the nature of the specific force employed in a specific factual situation." *Id.* "Neither tackling nor punching a suspect to make an arrest necessarily constitutes excessive force." *Blankenhorn*, 485 F.3d at 477 (citing *Graham*, 490 U.S. at 396 ("Not every push or shove, even if it may seem unnecessary in the peace of the judge's chambers, . . . violates the Fourth Amendment")). However, "even where some force is justified, the amount actually used may be excessive." *Santos v. Gates,* 287 F.3d 846, 853 (9th Cir. 2002).

The second step of the excessive force analysis is to "evaluate the government's interest in the use of force." *Lowry v. City of San Diego*, 858 F.3d 1248, 1257 (9th Cir. 2017) (internal citations omitted). Relevant factors in evaluating the state's interests include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. "These factors, however, are not exclusive." *Bryan*, 630 F.3d at 826. The Ninth Circuit has also held that "an important consideration in evaluating the [government's] interest in the use of force is 'whether officers gave a warning before employing the force.'" *Lowry* , 858 F.3d at 1259 (quoting *Glenn v. Washington Cty.*, 673 F.3d 864, 876 (9th Cir. 2011)). Additionally, courts should consider "the availability of less intrusive alternatives to the force employed," keeping in mind that "officers are not required to use the least intrusive degree of force possible." *Id.* (internal citations and quotation marks omitted). Further, "courts may in appropriate cases consider many [other] relevant factors, including 'whether a warrant was used, whether the plaintiff. . .was armed, whether more than one arrestee or officer was involved, whether the plaintiff was sober, whether other dangerous or exigent circumstances existed at the time of the arrest, and the nature of the arrest charges.'" *Robinson v. Solano County*, 278 F.3d 1007, 1014 (9th Cir. 2002) (altered) (quoting *Chew*, 27 F.3d at 1440 n.5).

"Because [the excessive force inquiry] nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, we have held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Smith*, 394 F.3d at 701. "This is because such cases almost always turn on a jury's credibility determinations." *Id.*

### B.    Excessive Force Discussion

The parties dispute several material facts relevant to the issue of excessive force, such as the level and type of the physical force used against Plaintiff, whether Plaintiff posed a threat to the safety of his mother and father, and the extent to which Plaintiff resisted the deputies' efforts to detain him. The parties also dispute the extent to which the deputies attempted any de-escalation methods prior to the use of force. The Court must make its excessive force determination by viewing the disputed facts in favor of Plaintiff as the non-moving party. *See Smith*, 394 F.3d at 701.

### 1.    Nature of Force

The "specific factual circumstances" of the case are relevant in classifying the force used. *Williamson v. City of National City*, 23 F.4th 1146, 1151-52 (9th Cir. 2022) (quoting *Lowry*, 858 F.3d at 1256). "The nature and degree of physical contact are relevant to this analysis, as are 'the risk of harm and the actual harm experienced.'" *Id.* (internal citations omitted).

Here, when considering the disputed facts in favor of Plaintiff, a reasonable jury could find the level of force, even if less than lethal, that was used against Plaintiff to be significant. Plaintiff has also presented a genuine dispute as to whether the kicks to his head constituted lethal force.

According to Plaintiff, Deputy Coldren jumped out of the bushes without telling him that he was under arrest, and Plaintiff was hit with such force that Plaintiff fell into the threshold of the residence where the deputies pinned Plaintiff down on the ground.[9] (PSAF No. 2 (citing to Pl.

---

[9] Defendants argue that Plaintiff fails to dispute that Plaintiff resisted Deputy Coldren's initial detention efforts as Plaintiff's cited evidence demonstrates that Plaintiff attempted to return to the residence. (DSUF Reply No. 46; DSAF No. 2 (citing to Pl. Ex. 1, Dep. of R. Huerta at 44: 3-17 ["[A]nd that's when one of the officers, to my recollection, uh, jumped out of the bushes and pulled my arm and tried to pull me down, and I kind of worked my way back into the house, and that's when they all jumped on me."])). However, Plaintiff also cites to the crime report prepared by Deputy Dillion, which states that Deputy Coldren "rushed Huerta and attempted to grab him in order to place Huerta into custody" and that Deputy Dillon "observed Deputy Coldren and Huerta fall backwards towards the threshold of the residence." (PSUF No. 46 (citing to Pl. Ex. 11, Crime Report at lines 58-61)). Further, Defendants' own account states that "[d]uring the deputies' attempts to restrain Plaintiff, the deputies and Plaintiff fell unintentionally through the threshold into the residence." (DSUF No. 48). Defendants have also submitted testimony from Deputy Dillon that Deputy Coldren's initial contact with Plaintiff pushed Plaintiff backwards. (Def. Ex. U, Dep. of J. Dillon at 82:13-18 ("Q: Do you know whether or not Deputy Coldren was moving with some kind of velocity such that his contact with him pushed Huerta back? A: Yes, it was to the point that where they fell backwards a bit, but like I said, they got stuck into the door.")). Accordingly, the Court finds a

Pl. Ex. 1, Dep. of R. Huerta at 44:9-14 [the deputy "jumped out of the bushes" and "pulled [Plaintiff's] arm" and tried to "pull [Plaintiff] down"]); PSAF No. 3; PSUF Nos. 46, 48). By Plaintiff's account, the level of force employed by Deputies Coldren, Dillon, Ceja, and Hernandez in taking Plaintiff to the ground was significant. *See Rice v. Morehouse*, 989 F.3d 1112, 1121 (9th Cir. 2021) (take-down maneuvers can involve "substantial" and "aggressive" force); *Savage v. City of Whittier*, No. 2:21-cv-0867-vAP-PDx, 2023 WL 6193035, at *13 (C.D. Cal., Aug. 30, 2023) (finding that "alleged approach of surprising [plaintiff] and dragging her by the arms essentially constituted a take-down maneuver [which] eventually brought [plaintiff] to the ground" and was "at least [a] non-trivial and potentially substantial and aggressive" level of force).

It is undisputed that during the struggle Deputy Ceja struck Plaintiff's leg twice with his baton, Deputy Dillon punched Plaintiff in the face, Deputy Hernandez punched Plaintiff in the face with a closed fist at least twice, and Deputy Coldren struck Plaintiff on the leg with a flashlight. (PSAF No. 4; DSAF No. 4). Impact blows, such as face punches, baton strikes, and flashlight strikes, are generally considered significant intermediate force that intrudes on an individual's Fourth Amendment rights. *See Smith*, 394 F.3d at 702 ("[I]ntermediate force is the most severe force authorized short of deadly force."); *Young v. Cty. of Los Angeles*, 655 F.3d 1156, 1161–62 (9th Cir. 2011) (citing *Smith*, 394 F.3d at 701–02) ("[B]aton blows are forms of force capable of inflicting significant pain and causing serious injury. As such, [an officer's use of a baton is] regarded as "intermediate force" that, while less severe than deadly force, nonetheless present[s] a significant intrusion upon an individual's liberty interests."); *Steinmeier v. Cty. of San Diego*, No. 18-cv-1603 JM (WVG), 2020 WL 377052, at *6 (S.D. Cal. Jan. 23, 2020) ("[P]unching, kicking, and/or hitting with a flashlight are intermediate levels of force that

---

triable issue of fact as to whether Plaintiff attempted to go back into the residence or whether Plaintiff was effectively pushed into the residence.

Defendants also dispute that the deputies pinned Plaintiff to the ground but do not dispute that Deputies Coldren, Ceja, and Hernandez controlled Plaintiff's right leg, left leg, and right shoulder. (DSAF No. 3 (citing Pl. Ex. 4, Dep. of R. Smith at 63:23-64:11, 68:19-69:10)). However, Sergeant Smith also testified that Deputy Dillon was positioned at Plaintiff's "[l]eft hand area, arm, shoulder." (Pl. Ex. 4, Dep. of R. Smith at 54:4-5; *see also id.* at 54:8-11 ("Q: . . .Mr. Huerta's right shoulder? A: Yeah. Hernandez is on this side, Dillon is on this side. . . And Coldren is on the right leg and Ceja is on the left leg."). The Court finds a triable issue of fact as to how the deputies held Plaintiff on the ground.

significantly intrude on Fourth Amendment rights."). While Defendants argue that "punches/pain compliance" constitute "low" force, (ECF No. 152 at 23), a reasonable jury could find that the punches to Plaintiff's face constituted significant intermediate force given the inherent risk of harm created by face punches and the actual harm Plaintiff suffered, including a broken nose and an orbital wall blowout fracture.[10] *See Williamson*, 23 F.4th at 1152 ("Consideration of both the actual harm and the risk of harm is important as the Fourth Amendment is concerned with reasonableness.").

According to Plaintiff, at least one of the deputies kicked Plaintiff in the head while he was on the ground.[11] (PSAF No. 5). Plaintiff argues that the kicks to his head may be considered lethal force. (ECF No. 155 at 14). The Ninth Circuit defines "lethal force" as "force that creates a substantial risk of death or serious bodily injury." *Bryan*, 630 F.3d at 825 n.6 (citing *Smith*, 394 F.3d at 705-07)). Head strikes can become deadly force in some circumstances if employed in a manner that creates a substantial risk of death or serious bodily injury. *See Seidner v. de Vries*, 39 F.4th 591, 597 (9th Cir. 2022) ("[P]hysical contact like hitting and shoving must be quantified based on the circumstances of the situation."); *Garlick v. Cty. of Kern*, 167 F.Supp. 3d 1117, 1147 (E.D. Cal. 2016) (internal citation omitted) ("A reasonable jury could conclude that the alleged baton blows to the head constitute deadly force."); *see also Williamson*, 23 F.4th at 1152 (whether the use of a certain type of force was reasonable depends on the risk of harm created by the force as well the actual harm). Here, Plaintiff asserts that he lost consciousness after "getting kicked in the face." (PSAF No. 5 (citing Pl. Ex. 1, Dep. of R. Huerta at 48:3-5). Plaintiff also

---

[10] Although Defendants dispute the cause of Plaintiff's injuries, Defendants do not dispute that Plaintiff went to the hospital on April 27, 2017, where a CT scan was performed on Plaintiff with findings of an orbital wall blowout fracture and nasal bone fracture. (PSAF No. 19; DSAF No. 19).

[11] Defendants contend the Court should not consider this fact, which they dispute, because Plaintiff's police practices expert testified that the use of force did not include kicks to the head. (DSAF No. 5; *see also* ECF No. 157, Def. Reply at 5 ("[A]ny purported kicks to the head are not at issue in this matter.")). However, Ms. Huerta testified that the deputies kicked Plaintiff in the head. (PSAF No. 5 (citing Pl. Ex. 2, Dep. of J. Huerta at 60: 8-13) ("They went into my house. They pushed me on the sofa. They threw Ramiro onto the ground. They kicked him in the head. One of them grabbed him from each hand, from the feet also, and two of them were hitting him with batons on his legs."). Moreover, as discussed herein, Plaintiff testified that he lost consciousness after he was kicked in the face. (PSAF No. 5 (citing Pl. Ex. 1, Dep. of R. Huerta at 48:3-5)). For purposes of summary judgment, the Court finds that Plaintiff has raised a dispute of fact as to whether the use of force included kicks to Plaintiff's head.

presents evidence that he suffers an ongoing traumatic brain injury attributable to the assault.[12]
(PSAF No. 20). Further, Plaintiff's expert opinion evidence states that serious bodily injury may
include "loss of consciousness, concussion, bone fracture, [and the] protracted loss or impairment
of function of any bodily member or organ[.]" (Pl. Appx. Ex. 2, Noble Expert Report at ¶¶ 61).[13]
Based on the foregoing, the Court finds that Plaintiff has raised a dispute of fact regarding the
severity of force implicated by kicks to the head. However, non-lethal head strikes alone "are a
sufficiently serious intrusion upon liberty that it must be justified by a commensurate state
interest." *Brown v. Grinder*, No. 2:13-cv-01007-KJM-KJN, 2019 WL 280296, at *8 (E.D. Cal.
Jan. 22, 2019).

It is also undisputed that Deputies Coldren and Dillon employed pepper spray against
Plaintiff. The use of pepper spray against an individual presents "a sufficiently serious intrusion
upon liberty that it must be justified by a commensurately serious state interest." *Young*, 655 F.3d
at 112-63.

Finally, although the use of hobble restraints may be considered non-excessive in some
circumstances, *see Perez v. City of Fresno*, 591 F.Supp.3d 725, 753-755 (E.D. Cal. 2022), it is
undisputed that Plaintiff's legs were placed in hobble restraints after he had already been
handcuffed and pepper sprayed. Under these circumstances, a reasonable jury could find such
force to be a significant intrusion on an individual's liberty interests. *See Blankenhorn*, 485 F.3d
at 479 (hobble restraints not justified to maintain control of arrestee who physically struggled
based upon the officer's "provocative conduct" in gang-tackling plaintiff prior to the use of
hobble restraints); *Garlick*, 167 F.Supp.3d at 1156 (E.D. Cal. 2016) (use of hobble restraints after
suspect was handcuffed and no longer posed a threat precluded a finding as a matter of law that
the response was justified).

---

[12] Defendants do not dispute that the neurologist report presented by Plaintiff states that Plaintiff was
diagnosed with a "[t]raumatic brain injury secondary to assault." (DSAF No. 20). However, Defendants
dispute the cause of Plaintiff's injuries. (*Id.*)

[13] Defendants object to portions of Plaintiff's expert opinion declaration and report, and several statements
from Plaintiff's additional statement of facts that rely on Plaintiff's expert opinion evidence, on several
evidentiary grounds, including improper expert opinion, relevance, and lack of foundation. (*See e.g.*, ECF
No. 157-2). Defendants' evidentiary objections as to Plaintiff's expert opinion evidence are overruled
without prejudice to Defendants raising such objections in pre-trial motions.

### 2. Government Interests at Stake

The degree of force used must be "warranted by the governmental interests at stake." *Deorle v. Rutherford*, 272 F.3d 1272, 1282 (9th Cir. 2001); *see also Chew*, 27 F.3d at 1441 ("The [factors] bearing on the reasonableness of a particular application of force, are not to be considered in a vacuum but only in relation to the amount of force used to effect a particular seizure[.]").

Here, when construing the disputed facts in favor of Plaintiff, a reasonable jury could find the government interest at stake was not commensurate with the force used against Plaintiff.

### a. Immediate Threat to the Safety of Others

"[W]hether the suspect [pose[d] an immediate threat to the safety of the officers or others, is the most important single element of the three specified [*Graham*] factors." *Lowry*, 858 F.3d at 1258 (internal quotation marks omitted). Ninth Circuit precedent focuses on "the *immediate* threat of harm," i.e., "the danger a suspect poses *at the time the force is applied*." *Andrews v. City of Henderson*, 35 F.4th 710, 717 (9th Cir. 2022) (internal quotations omitted) (emphasis in original).

According to Plaintiff, he did not put his parents, including his mother, in harm's way and did not shove them. (PSUF No. 34) (citing to Pl. Ex. 2, Dep. of J. Huerta; Pl. Ex. 3, Dep. of P. Huerta). During her deposition, Ms. Huerta testified that Plaintiff did not push her or push her away from the door. (Dep. of J. Huerta at 52:1-6, 72:1-12) Mr. Huerta testified that he did not see Plaintiff push Ms. Huerta. (Dep. of P. Huerta at 17:21-18:4). Mr. Huerta also testified that Plaintiff did not push him. (*Id.* at 18:1-2). Defendants argue the deposition testimony does not create a dispute of fact because the body worn camera footage "speaks for itself." (DSUF Reply No. 34). The Court has reviewed the body worn camera footage.[14] Although it appears that

---

[14] The Court notes that Plaintiff objects to the composite video and transcript submitted by Defendants (Def. Ex. A, Composite Video) because the "subtitles are inaccurate sometimes." (*See* ECF No. 156-6 at 2-3. For the purposes of summary judgment, Plaintiff's objections to Defendants' video evidence based on lack of foundation, improper legal opinion and conclusion, lack of personal knowledge, hearsay, and relevance are overruled. *See Burch v. Regents of Univ. of Cal.*, 433 F.Supp.2d 1110, 1119 (E.D. Cal. 2006) ("[W]hen evidence is not presented in an admissible form in the context of a motion for summary judgment, but it may be presented in an admissible form at trial, a court may still consider that evidence."); *Sec. and Exch. Comm'n v. Criterion Wealth Mgmt. Servs., Inc.*, 599 F.Supp.3d 932, 945 (C.D. Cal. 2022) (objections on the basis that an assertion calls for a legal conclusion are "duplicative of the summary judgment standard itself"); *see id.* ("[M]ost relevance-based evidentiary objections are moot in the context of summary judgment motions."). Plaintiff may address evidentiary issues as to the admissibility of Defendants' evidence in pre-trial motions or during the trial.

Plaintiff held up his hands to his parents while in the doorway behind the screen door, the video footage itself is dark and does not present an unobstructed, complete view of the doorway or a continuous view of the doorway during the entire encounter. Moreover, Defendants have not presented any evidence that Plaintiff was armed with a dangerous weapon or that he threatened the safety of the TCSD deputies when he stepped outside of the residence in his underwear and a tank top to close the front gate. (*See* Pl. Ex. 1, Dep. of R. Huerta at 48:8). Drawing all reasonable inferences in Plaintiff's favor, a jury could conclude, based on the body worn camera footage, that Plaintiff did not pose an imminent threat to his parents. *See Dudgeon v. Cty. of Sonoma*, No. 19-cv-05615-JCS, 2021 WL 5407519, at *1-4, 9 (N.D. Cal. Nov. 18, 2021) (bodycam footage of doorway encounter after law enforcement responded to 911 call because husband was "acting crazy" did not clearly establish that husband posed an immediate threat to the safety of his wife in light of wife's alternative interpretation of the interaction).

### b.    *Severity of the Crime*

The Ninth Circuit has noted that "misdemeanors are relatively minor and will generally not support the deployment of significant force." *Bryan*, 630 F.3d at 829 n.12.

Plaintiff's alleged misdemeanor crimes of public intoxication and making harassing phone calls are non-severe. *See Santos*, 287 F.3d at 854 (public intoxication is "not at all serious" as to justify "taking a passive individual to the ground with force sufficient to break his back"). Elder abuse, however, is a potentially serious offense. The Ninth Circuit has acknowledged that, while the domestic violence context presents a heightened possibility of danger, the circumstances may or may not "warrant the conclusion that [the suspect] was a particularly dangerous criminal or that his offense was especially egregious." *Smith*, 394 F.3d at 702 (finding that officers operated under mere speculative beliefs about the perceived possible danger rather than the actual context of plaintiff standing apart from his wife, in his pajamas, and unarmed); *see also Andrews*, 35 F.4th at 717 ("But we must consider [the fact that armed robbery is a serious crime] in the full context that the officers faced, including that [armed robbery suspect] was not engaged in any violent or nonviolent criminal conduct when he was tackled without warning by the detectives."). As discussed above, it is disputed whether Plaintiff posed a serious threat of harm to his parents. And although Defendants argue that "[b]ased on the totality of the circumstances, Defendant

Deputies believed they had probable cause to arrest Plaintiff[]," (ECF No. 152 at 25), whether the deputies had a reasonable belief that Plaintiff was guilty of any crime is not relevant to whether the severity of those crimes warranted the force used to detain Plaintiff. Further, Defendants have offered no evidence to suggest that Plaintiff's conduct rose to the level of felony elder abuse.

Accordingly, a reasonable jury could find that the severity of the crimes at issue provided insufficient justification for the use of significant force to effectuate Plaintiff's detention.

### c.    Resistance/Evasion

"[T]he Fourth Amendment permits police officers to use some force to overcome resistance to being arrested." *Blankenhorn*, 485 F.3d at 479. "[A] person has the limited right to offer reasonable resistance to an arrest that is the product of an officer's personal frolic. That right is not triggered by the absence of probable cause, but rather by the officer's bad faith or provocative conduct." *Id.* (internal quotation marks and citations omitted). *See also Bryan*, 630 F.3d at 830 ("[T]he level of force an individual's resistance will support is dependent on the factual circumstances underlying that resistance.").

It is undisputed that the deputies never told Plaintiff that he was under arrest before executing the surprise detention. (PSAF No. 2). Further, and as discussed above, *see supra* p. 9 n.9, the Court finds a dispute of fact as to whether Plaintiff attempted to flee Deputy Coldren's initial attempt to detain Plaintiff outside the residence or whether Plaintiff was pushed into the threshold of the residence by Deputy Coldren.

Defendants also contend that Plaintiff violently resisted the deputies' efforts to detain him once Plaintiff was on the ground, including punching Deputy Dillon in the face and forcibly grabbing Deputy Hernandez's shirt. However, Plaintiff denies that he resisted the deputies' efforts to physically restrain him before and after he was handcuffed. According to Plaintiff, he lost consciousness during the encounter after getting kicked in the face.[15] (PSAF No. 6). Plaintiff asserts that he does not remember hitting or kicking any deputy, and he does not remember "a good part of after the kicks." (PSAF No. 7 (citing Pl. Ex. 1, Dep. of R. Huerta at 47: 12-18)).

---

[15] Defendants contend that Plaintiff's cited evidence fails to support this fact. (DSAF No. 7). While the deposition testimony cited by Plaintiff does not appear relevant to this assertion, Plaintiff testified elsewhere that the last thing he remembers before he blacked out was getting kicked in the face. (Pl. Ex. 1, Dep. of R. Huerta at 47:25-48:1-5).

Further, Ms. Huerta asserts that she did not see Plaintiff hit the deputies.[16] (PSAF No. 7 (citing Pl. Ex. 2, Dep. of J. Huerta at 61:2-3). Plaintiff asserts that once he regained consciousness, he had been handcuffed and was being carried out of the residence by the deputies in his underwear and a tank top. (*See* Pl. Ex. 1, Dep. of R. Huerta at 48: 6-23). Defendants assert that Deputy Dillion (with Deputy Coldren's assistance) pepper sprayed Plaintiff's face outside of the patrol car because Plaintiff continued to resist by kicking his legs at the deputies as Plaintiff was moved to the patrol car. (DSUF No. 56). Defendants also assert that Deputy Dillon used a soft hobble restraint on Plaintiff because Plaintiff was kicking his legs as he was placed into the patrol car. (DSUF No. 57). According to Plaintiff, the deputies did not say anything to him as he was carried out and they pepper sprayed him for no apparent reason. (PSUF No. 56 (citing Pl. Ex. 1, Dep. of R. Huerta at 48:13- 49:16)).[17]

Based on the undisputed nature of the surprised detention, and when viewing the disputed facts in the light most favorable to Plaintiff, a reasonable jury could conclude that Plaintiff was not attempting to evade arrest by flight and that Plaintiff did not physically resist the deputies by punching, kicking or grabbing the deputies. Moreover, a reasonable jury could conclude that the deputies' conduct—such as telling Plaintiff to "stop acting like a jackass or we're going to come in there"[18] prior to detaining Plaintiff by surprise, striking Plaintiff multiple times in the face with punches and kicks, pepper spraying Plaintiff in the face while he was handcuffed, and hobble tying Plaintiff's legs while he was handcuffed and after he had been pepper sprayed—was sufficiently provocative as to trigger Plaintiff's right to offer reasonable resistance. *See Blankenhorn*, 485 F.3d at 478-80 (a reasonable jury could find that the plaintiff acted within his "limited right to offer reasonable resistance to an arrest" when he "struggled" with officers after

---

[16] Defendants contend that Ms. Huerta's deposition testimony does not create a disputed fact as to whether Plaintiff physically resisted the deputies' efforts to detain him. (ECF No. 157 at 5-6). However, "contradictory deposition testimony [is] sufficient to create a genuine issue of material fact." *Nelson v. City of Davis*, 571 F.3d 924, 929 (9th Cir. 2009).

[17] Defendants contend that Plaintiff fails to dispute that he continued to resist by kicking the deputies as he was moved into the patrol car and that Plaintiff was kicking his legs as he was placed into the patrol car. (DSUF Reply Nos. 56, 57). However, as discussed above, Plaintiff asserts that he does not remember kicking the deputies. For purposes of summary judgment, the Court finds a dispute of fact as to whether Plaintiff continued to resist as he was moved into the patrol car after he was handcuffed.

[18] Defendants to not dispute this statement. (DSUF Reply No. 31).

being gang-tackled and "tried to stay on his feet while [the] officers wrestled with him"); *Ballew v. City of Pasadena*, 642 F.Supp.3d 1146, 1182-83 (C.D. Cal. 2022) (a reasonable jury could find officers' provocative conduct gave rise to limited resistance based on plaintiff's assertion that officer struck him with baton even though plaintiff complied with the officers' orders); *Clark v. Cty. of Los Angeles*, No. CV 20-304-DMG (MRWx), 2021 WL 6882325, *6 (C.D. Cal. Dec. 13, 2021) (a reasonable jury could find plaintiff exercised reasonable resistance when he "arched his back and thrashed his legs in an attempt to get out from under" the officer after the officer "pushed him to the ground swiftly").

### d.       Other Factors

The Ninth Circuit has held that "[a]ppropriate warnings comport with actual police practice," and "giving of a warning or the failure to do so is a factor to be considered in applying the *Graham* balancing test." *Deorle*, 272 F.3d at 1284. Here, it is undisputed that Deputy Coldren concealed himself in the front yard so that he could detain Plaintiff if Plaintiff walked outside of the residence. According to Plaintiff, the deputies could have warned Plaintiff that he was under arrest prior to the use of force. (PSAF No. 49 (citing Pl. Ex. 10, Smith Trial Testimony at 54:7-15 [Q: Would you agree with me that before force was utilized, Mr. Coldren or any officer could've said, "Mr. Huerta, we're placing you under arrest, please come out? A: Yes, they could've.])). Based on the foregoing, a reasonable jury could find that the deputies' failure to warn Plaintiff prior to the use of force weighs in favor of a conclusion that the force used against Plaintiff was excessive. *See Savage*, 2023 6193035, at *9 (failure to warn plaintiff that her conduct "would lead to her forceful arrest, or that officers intended to arrest her for conduct that had taken place at least a minute earlier" weighs in favor of finding a triable issue as to excessive force).

"Police are required to consider what other tactics if any were available and if there were clear, reasonable and less intrusive alternatives to the force employes, that militates against finding the use of force reasonable." *Glenn*, 673 F.3d at 876 (internal quotation marks omitted) (citing *Bryan*, 630 F.3d at 831). Here, Plaintiff disputes the extent to which the deputies and Sergeant Smith could have used other tactics to gain Plaintiff's compliance or attempted to de-escalate the situation before executing the surprise detention. (PSAF No. 49 (citing to Dec. of Jeffrey Noble at ¶7, Opinion #1(g)). Defendants contend that it is undisputed that "Sergeant

Smith employed de-escalation during the incident." (DSAF No. 49 (citing PSUF No. 32, 36)).
According to the opinion of Plaintiff's police practices expert, however, the deputies "never engaged in de-escalation tactics in order to try and calm the situation down, with the exception of one short period of time where Sergeant Smith began to ask him about his plants, which actually was effective for a few seconds. And that would have signaled a reasonable officer that additional de-escalation tactics may become effective if [used]." (Dec. of Jeffrey Noble at ¶7, Opinion #1(g)). Based on Plaintiff's expert opinion evidence, a reasonable jury could find that the deputies' attempts to deescalate the situation were insufficient. *See Smith*, 394 F.3d at 703 (a rational jury could conclude, based on police training expert's declaration, that officers failed to employ available and less intrusive means for subduing plaintiff). Further, the fact that there were multiple deputies on the scene supports a finding that the deputies failed to pursue less intrusive methods to resolve the situation. *See Rodriguez v. City of Modesto*, No. 1:10-cv-01370-LJO-MJS, 2015 WL 1565354, at *16 (E.D. Cal. April 8, 2015) (quoting *Bryan*, 630 F.3d at 831) ("The number of officers available changes 'the tactical calculus' because multiple officers had myriad ways to resolve the situation 'without the need for an intermediate level of force.'"). Finally, as there was time to plan and execute the surprise detention before the use of force, a reasonable jury could find that there was also time to plan and execute a less intrusive means of detaining Plaintiff. *See Blankenhorn*, 485 F.3d at 478 ("[T]he pace of events could reasonably lead to the conclusion that the latitude *Graham* requires for split-second police judgments in 'tense, uncertain, or rapidly evolving' situations was not warranted here.").

Based on the foregoing, a reasonable jury could conclude that Deputies Coldren, Dillon, Hernandez, and Ceja violated Plaintiff's Fourth Amendment right to be free from unreasonable force.

### C.   Qualified Immunity

"Qualified immunity is an entitlement not to stand trial or face the other burdens of litigation." *Saucier v. Katz*, 533 U.S. 194, 200 (2001) (internal citation and quotation marks omitted). Defendants are entitled to such relief only if the facts alleged and evidence submitted, resolved in Plaintiff's favor and viewed in the light most favorable to him, "show that their conduct did not violate a federal right; or, if it did, the scope of that right was not clearly

established at the time." *Blankenhorn*, 485 F.3d at 471. "[S]ummary judgment is appropriate only if Defendants are entitled to qualified immunity on the facts as alleged by the non-moving party." *Id.* at 477-78; *see also Rodriguez*, 2015 WIL 1565354, at *24 (citing *Mueller v. Auker*, 576 F.3d 979, 1006 (9th Cir. 2009)) ("It is beyond dispute that for the purposes of qualified immunity analysis, the Court must use the injured party's facts.").

Defendants argue that Plaintiff fails to identify any case which demonstrates that the deputies' conduct violated a clearly established or statutory right. (ECF No. 157 at 8). Plaintiff primarily argues that the circumstances of this case, including the low severity of the crimes at issue, the fact that plaintiff did not pose an imminent threat and did not resist arrest, and the availability of less intrusive means to arrest Plaintiff, strongly favor a finding of unconstitutional force that was clearly established at the time of the incident. (ECF No. 152 at 27).

By Plaintiff's account of events, the contours of Plaintiff's right to be free from excessive force under the circumstances in this case were well established before the April 2017 incident. In *Blankenhorn*, the Ninth Circuit held that it was clearly established by 2001 that gang-tackling an individual suspected of a misdemeanor crime, who posed no serious threat to the safety of the officers or others, and who engaged in his limited right to resistance following the officers' provocative conduct violated, the suspect's Fourth Amendment rights:

> We need look no further than *Graham*'s holding that force is only justified when there is a need for force. We conclude that this clear principle would have put a prudent officer on notice that gang-tackling without first attempting a less violent means of arresting a relatively calm trespass suspect—especially one who had been cooperative in the past and was at the moment not actively resisting arrest—was a violation of that person's Fourth Amendment rights.

485 F.3d at 478-481; *see also Andrews*, 35 F.4th 710 (internal quotation marks omitted) ("We hold that *Blankenhorn* clearly established [in 2007]—and thus put a prudent officer on notice—that an officer violates the Fourth Amendment by tackling and piling on top of a relative calm, non-resisting suspect who posed little threat of safety without any prior warning and without attempting a less violent means of effectuating an arrest.").

Furthermore, in *Smith*, the Ninth Circuit concluded that the domestic violence context will not justify the use of significant force in every circumstance, especially when the arrestee is unarmed and does not pose an immediate threat:

19

Analyzing the officer's conduct in light of the *Graham* factors (and accepting Smith's version of the facts as correct), we determined that Smith did not pose an immediate threat because he was unarmed and in his pajamas, notwithstanding the fact that, prior to being handcuffed, he disregarded the officers' orders, refused to put up his hands, and was shouting expletives. *Id.* at 702. Second, we stated that an allegation of domestic violence did not "warrant the conclusion that Smith was a particularly dangerous criminal or that his offense was especially egregious." *Id.* at 702–03. Third, we noted that although Smith continued to ignore the officers' orders and physically resisted arrest, he did not attack the officers or "show[ ] any signs of fleeing the area." *Id.* at 703. Finally, we considered the "availability of alternative methods of capturing or subduing a suspect," concluding that "the officers could and should have used control holds to complete the arrest rather than ... sic[cing the canine] on him once they had him restrained on the ground." *Id.*

*Davis*, 478 F.3d at 1055 (discussing *Smith*); *see id.* at 1057 ("As noted earlier, *Smith* is only one of a number of our cases that inform law enforcement officers of their obligation under the Constitution to refrain from the use of excessive force.").

In *Young*, the Ninth Circuit held that it was clearly established by 2001 that "it is unreasonable to use significant force [baton blows and pepper spray] against a suspect who was suspected of a minor crime, posed no apparent threat to officer safety, and could be found not have resisted arrest." 655 F.3d at 1168. *See also Savage*, 2023 6193035, at *17 (citing *Young*, 655 F.3d at 1168) ("The Ninth Circuit clearly has established that circumstances presented in this case were well established before [plaintiff's] arrest—forcefully grabbing [plaintiff's] arms by surprise, dragging her a few feet, pushing and pulling her to the ground, and subjecting her to further force thereafter—may be unconstitutional when applied to a plaintiff who poses little to no immediate threat and is suspected of committing crimes of minimal severity.").

In *LaLonde v. Cty. of Riverside*, the Ninth Circuit held that the use of pepper spray, "may be reasonable as a general policy to bring an arrestee under control, but in a situation in which an arrestee surrenders and is rendered helpless, any reasonable officer would know that a continued used of the weapon or a refusal without cause to alleviate its harmful effects constitutes excessive force." 204 F.3d 947, 961 (9th Cir. 2001).

These cases, taken together, would put a reasonable officer on notice that the force alleged in this case could violate a person's Fourth Amendment right. *See Young*, 655 F.3d at 1167 ("[T]he relevant inquiry is whether the state of the law at the time of the official conduct ... was such as to give the defendants 'fair warning' that their conduct was unconstitutional—that a fair

application of well-established legal principles would warrant such a conclusion"); *White v. Pauly*, 580 U.S. 73, 79 (2017) (stating that qualified immunity analysis "do[es] not require a case directly on point") (citation omitted). Accordingly, Deputies Coldren, Dillon, Ceja, and Hernandez are not entitled to qualified immunity.

Thus, Defendants' motion for summary judgment is denied, in part, as to Plaintiff's fifth cause of action for violation of civil rights to the extent Plaintiff alleges that Deputies Coldren, Dillon, Ceja and Hernandez violated his Fourth Amendment right to be free from unreasonable force.

## II.   PLAINTIFF'S CLAIMS AGAINST SERGEANT SMITH

As an initial matter, it is undisputed that Sergeant Smith did not physically participate in the use of force against Plaintiff. However, the parties disagree as to whether Sergeant Smith may be held liable based on the allegations in Plaintiff's SAC regarding the use of force employed by TCSD deputies during the incident.

### A.   The Parties' Contentions

Defendants' motion for summary judgment generally argues that Plaintiff fails to present evidence to support any cause of action against Sergeant Smith. (ECF No. 152 at 34). Plaintiff asserts that Sergeant Smith is subject to Section 1983 liability under the Fourth Amendment because he participated in the use of force by ordering the "ruse" and because he had a reasonable opportunity to intercede during the use of force incident between Plaintiff and Deputies Coldren, Dillon, Ceja, and Hernandez, yet failed to do so. (ECF No. 156 at 27-29). In reply, Defendants argue Plaintiff's SAC does not allege failure to intervene as a theory of liability and that Plaintiff's allegations regarding excessive force do not support such liability. (ECF No. 157 at 11).

During oral argument, Plaintiff argued that Sergeant Smith is subject to supervisory liability. In response, Defendants argued that Plaintiff's SAC did not plead supervisory liability against Sergeant Smith, and that supervisory liability must be pled as a separate claim.

### B.   Sergeant Smith Discussion

The Court agrees with Defendants that Sergeant Smith cannot be held liable under a "failure to intervene" theory. An officer "can be held liable for failing to intercede [when their

fellow officers violate the constitutional rights of a suspect or other citizen] *only* if they had an opportunity to intercede." *Cunningham v. Gates,* 229 F.3d 1271, 1289 (9th Cir. 2000) (emphasis added). Here, Plaintiff does not allege that Sergeant Smith had a reasonable opportunity to intercede during the incident but failed to do so.

However, Sergeant Smith is subject to liability based on his integral participation in the force by directing the surprise detention. *See Hughes v. Rodriguez*, 31 F.4th 1211, 1223 (9th Cir. 2022) (quoting *Boyd v. Benton County*, 374 F.2d 773, 780 (9th Cir. 2004)) ("[O]fficers can be held liable for excessive force on a theory of integral participation only if they participate 'in some meaningful way' in the specific actions that constituted the violation."); *Monteilh v. Cty. of Los Angeles*, 820 F.Supp.2d 1081, 1089 (C.D. Cal. 2011) (citing *Jones v. Williams*, 297 F.3d 930, 936 (9th Cir. 2002)) ("[I]ntegral participation requires some fundamental involvement in the conduct that allegedly caused the violation."). As discussed extensively above, a reasonable jury could find the surprise detention of Plaintiff was constitutionally unreasonable. As it is undisputed that Sergeant Smith planned the surprise detention, a reasonable jury could also find that Sergeant Smith was fundamentally involved in the force used against Plaintiff.

Sergeant Smith is also subject to liability based on his direct causal involvement in the force. *See Keates v. Koile*, 883 F.3d 1228, 1242–43 (9th Cir. 2018) (quoting *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011)) (An official is liable under Section 1983 so long as "there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation."); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 676-77 (2009) ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*."). Here, "[t]he requisite causal connection" was established when Sergeant Smith directed Deputy Coldren to execute the surprise detention, thus, "setting in motion a series of acts by others" that Sergeant Smith "knew or reasonably should have known would cause others to inflict a constitutional injury." *Starr*, 652 F.3d at 1207–08 (internal quotation marks and citations omitted) (alterations in original). If Deputies Coldren, Dillon, Ceja, and Hernandez used excessive force in violation of the Fourth Amendment, then Sergeant Smith's "liability as supervisor depends on whether he set in motion a series of acts by others, or knowingly refused to

terminate a series of acts by others, which he knew or reasonably should have known, would cause others to inflict the constitutional injury." *Blankenhorn*, 485 F.3d at 485 (quoting *Larez, 946 F.2d at 646*). It is undisputed that Sergeant Smith was in charge of the scene and orchestrated the ruse to detain Plaintiff. Thus, a reasonable jury could also conclude that Sergeant Smith knew or reasonably should have known that the deputies' execution of the ruse would violate Plaintiff's Fourth Amendment right to be free from unreasonable force. *See Rodriguez v. Cty. of Los Angeles*, 891 F.3d 776, 798 (9th Cir. 2018) (quoting *Keates*, 883 F.3d at 1243) ("[The supervising sergeants] concede that they were personally present and directed the deputies' use of force against appellees. Even assuming that their presence and direction of the extraction teams does not constitute 'personal involvement,' there is a 'sufficient causal connection' to establish the sergeants' supervisory liability for their "'own culpable action or inaction in the ... supervision [and] control of' the deputies.").

Although Defendants now argue, for the first time, that Plaintiff fails to state a claim for excessive force against Sergeant Smith, Plaintiff's operative complaint adequately alleges that Sergeant Smith is liable for excessive force based on his own direct causal actions and fundamental involvement in the use of force. Plaintiff alleges that TCSD deputies, including Sergeant Smith, pretended to leave the scene so that when Plaintiff walked out into his yard a hiding deputy could tackle Plaintiff from behind. (ECF No. 22 at 5) ("The officers then appeared to leave the premises. Plaintiff and his mother observed their taillights as they purportedly left the scene. Plaintiff then opened the screen door to lock the family's front gate. As Plaintiff walked into the front yard, he was tackled from behind by an officer who had been hiding in the bushes outside Plaintiff's residence. Other officers shortly joined the officer who had surreptitiously tackled Plaintiff."). Plaintiff's factual allegations regarding the ruse employed by TCSD deputies are directly pertinent to Plaintiff's excessive force claim and whether the amount of force used against Plaintiff was justified under the circumstances. As Plaintiff alleges, the execution of the ruse by TCSD deputies set in motion the physical force used against Plaintiff. Plaintiff's pleading is more than sufficient to give fair notice to Sergeant Smith that Plaintiff was asserting an excessive force claim against him for his central role in the incident, even if Sergeant Smith was the one who only directed and did not himself use the force at issue.

Accordingly, Defendants' motion for summary judgment is denied, in part, as to Plaintiff's fifth cause of action for violation of civil rights to the extent Plaintiff alleges that Sergeant Smith violated his Fourth Amendment right to be free from unreasonable force.

## IV.   DENIAL OF MEDICAL CARE

Plaintiff alleges that Defendants violated his Fourth Amendment rights when he was denied medical care after he was taken to the emergency room. (ECF No. 22 at 22-23). Defendants argue they are entitled to summary judgment because they fulfilled their constitutional obligation by immediately taking Plaintiff to the emergency room after the incident.

The Fourth Amendment requires law enforcement officers to provide objectively reasonable post-arrest care to an apprehended suspect. *Tatum v. City and Cty. of San Francisco*, 441 F.3d 1090, 1099 (9th Cir. 2006). For example, "a police officer who promptly summons...necessary medical assistance has acted reasonably for purposes of the Fourth Amendment[.]" *Id.* at 1098–99; *see also City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 245 (1983) ("Whatever the standard may be, [the defendant] fulfilled its constitutional obligation by seeing that [the apprehended person] was taken promptly to the hospital that provided the treatment necessary for his injury."). "[T]he critical inquiry is not whether the officers did all that they could have done, but whether they did all that the Fourth Amendment requires." *Tatum*, 441 F.3d at 1099.

The TCSD Deputy Defendants are entitled to summary judgment on Plaintiff's Fourth Amendment claim based on the denial of medical care. It is undisputed that Deputies Coldren and Dillon took Plaintiff to the emergency room after the incident. In opposition, Plaintiff argues that "Defendants only provided Plaintiff with emergency room attention which proved insufficient to address his injuries," and also failed to wash out Plaintiff's eyes even though he had been pepper sprayed. (ECF No. 156 at 19).

Even accepting Plaintiff's facts as true, TCSD Deputy Defendants met the minimum standard of reasonableness under the Fourth Amendment by promptly taking Plaintiff to receive medical care. *Tatum*, 441 F.3d at 1099 (holding that a police officer who promptly summons the necessary medical assistance, even if the officer does not in the meantime administer CPR, has acted reasonably for purposes of the Fourth Amendment).

24

1  Accordingly, Defendants' motion for summary judgment is granted, in part, as to

2  Plaintiff's fifth cause of action for violation of civil rights to the extent Plaintiff alleges that

3  TCSD Deputy Defendants violated his Fourth Amendment rights by denying him medical care.

**STATE LAW CLAIMS**

4

5  Defendants move for summary judgment on the remaining state law claims for battery,

6  assault, false imprisonment, negligent hiring and supervision, negligent training, and Bane Act

7  Violations. These claims are asserted against TCSD Deputy Defendants[19] directly and against

8  TCSD vicariously[20].

**I.    ASSAULT & BATTERY**

9

10  Plaintiff's state law claims for assault and battery rest on the same alleged facts as

Plaintiff's excessive force claim. To succeed on these claims, Plaintiff must demonstrate that

11  Deputies Coldren, Dillon, Ceja, and Hernandez acted unreasonably. *Nelson v. City of Davis*, 709

12  F.Supp.2d 978, 992 (E.D. Cal. 2010) ("[T]he same standards apply to both state law assault and

13  battery and Section 1983 claims premised on constitutionally prohibited excessive force[.]");

14  *Brown v. Ransweiler,* 89 Cal.Rptr.3d 801, 811 (2009) ("A state law battery claim is a counterpart

15  to a federal claim of excessive use of force. In both, a plaintiff must prove that the peace officer's

16  use of force was unreasonable."). Defendants' only argument in support of their request for

17  summary judgment on Plaintiff's battery and assault claims is that no reasonable juror could find

18  that Deputies Coldren, Dillon, Ceja, and Hernandez used excessive force against Plaintiff. As

19  discussed above, whether the use of force employed by the deputies was objectively reasonable

20  _____

21  [19] Defendants' motion for summary judgment argues that Sergeant Smith is entitled to summary judgment because Sergeant Smith "did not use any force on Plaintiff during the incident and Plaintiff fails to provide

22  any evidence in support of the other causes of action alleged against [Sergeant] Smith." (ECF No. 152 at 34). Defendants' reply further argues that if the Court find that Sergeant Smith may be held liable at to

23  Plaintiff's claim for excessive force, then "judgment should be granted for Sergeant Smith on Plaintiff's state law claims because, as Plaintiff admits, all of those claims are inextricably intertwined with

24  Plaintiff's excessive force allegations[.]" (ECF No. 157 at 11). As this argument is the same as addressed above in relation to the excessive force claims, the Court denies summary judgment on the same basis as

25  to the state law claims against Sergeant Smith.

[20] "A public entity, as the employer, is generally liable for the torts of an employee committed within the

26  scope of employment if the employee is liable." *Thomas v. City of Richmond*, 9 Cal.4th 1154, 1157 (1995); Cal. Gov. Code § 815.2. Thus, TCSD is not entitled to summary judgment to the extent the Court

27  finds that TCSD Deputy Defendants are not entitled to summary judgment on Plaintiff's state law tort claims for assault, battery, false imprisonment, intentional infliction of emotional distress, and negligent

28  infliction of emotional distress.

under the circumstances is a triable issue of fact that must go to the jury. Further, Defendants concede that Plaintiff's assault and battery claims "are inextricably intertwined with Plaintiff's excessive force allegations," (ECF No. 157 at 11). Accordingly, Defendants' motion for summary judgment as to Plaintiff's first and second causes of action state law claims for battery and assault is also denied.

## II.     FALSE IMPRISONMENT

Plaintiff alleges that he was "wrongfully restrained and detained by Defendants, via intentional conduct, including physical force and threats, such that Plaintiff was compelled to stay in custody for an appreciable amount of time." (ECF No. 22 at 11). Defendants argue they are entitled to statutory immunity as to Plaintiff's claim for false imprisonment because the deputies reasonably believed they had probable cause to arrest Plaintiff for a crime "such as harassing phone calls, potential elder abuse, and resistance/obstruction of a peace officer." (ECF No. 152 at 30-31).[21]

### A.     False Imprisonment Legal Standards

Under California law, false imprisonment is the "unlawful violation of the personal liberty of another." *Asgari v. City of Los Angeles,* 63 Cal.Rptr.2d 842, 850 (Cal. 1997). "False arrest is but one way of committing a false imprisonment." *Collins v. City & Cty. of San Francisco,* 123 Cal.Rptr. 525, 526 (1975). False arrest "relat[es] to conduct that is without valid legal authority." *Asgari,* 63 Cal.Rptr.2d at 937. Law enforcement officers, acting within the scope of their authority, cannot be held liable "for false arrest or false imprisonment arising out of any arrest [where]. . .[t]he arrest was lawful, or the peace officer, at the time of the arrest, had reasonable cause to believe the arrest was lawful." Cal. Penal Code § 847 (b)(1). A warrantless arrest is lawful when (1) "the officer has  probable cause to believe that the person to be arrested has committed a public offense in the officer's presence"; (2) "the person arrested has committed a felony, although not in the officers' presence"; and (3) "the officer has probable cause to believe

---

[21] Defendants also argue they are entitled to statutory immunity because Plaintiff was ultimately convicted on criminal charges arising from the incident. (*Id.* at 31) (citing *Heck v. Humphrey*, 512 U.S. 477, 489 (1994)).  However, Defendants do not explain how a finding in favor of Plaintiff regarding his state law false imprisonment claims would necessarily challenge the validity of Plaintiff's criminal misdemeanor conviction for annoying phone calls. *See Heck*, 512 U.S. at 486.

that the person to be arrested has committed a felony, whether or not a felony, in fact, has been

committed." Cal. Penal Code § 836 (a)(1)-(3).

   "Reasonable cause to arrest exists when the facts known to the arresting officer would

lead a reasonable person to have a strong suspicion of the arrestee's guilt." *O'Toole v. Superior*

*Court*, 44 Cal.Rptr.3d 531, 549 (2006). "Because the issue of reasonable cause is an objective

one, there can be no false arrest if the officers had at least one reasonable ground to arrest an

individual, even if the officers' additional reasons were not valid." *Id.* "[T]he existence of

probable cause is a question for the jury, though summary judgment is appropriate when there is

no genuine issue of fact and if no reasonable jury could find an absence of probable cause under

the facts." *Johnson v. Barr*, 79 F.4th 996, 1003 (9th Cir. 2023) (quoting *Gasho v. United States*,

39 F.3d 1420, 1428 (9th Cir. 1994); *see also O'Toole*, 44 Cal.Rptr.3d at 549 ("Where the facts are

undisputed, the issue of reasonable cause for an arrest is a question of law.").

   **B.     False Imprisonment Discussion**

   Defendants rely on the argument that Plaintiff's false imprisonment claims fail as a matter

of law because there was probable cause to arrest Plaintiff for public intoxication, annoying

phone calls, and elder abuse. (ECF No. 157 at 9). Defendants also argue that probable cause is

undisputed because Plaintiff was criminally charged (and ultimately convicted) with a crime

arising from the incident. (*Id.*) Here, it is undisputed that Plaintiff was charged by criminal

complaint with three counts violation of Penal Code § 148(a) (misdemeanor resisting arrest) and

one count violation of Penal Code § 653m(b) (annoying telephone calls).[22] (PSAF Nos. 26, 27). It

is also undisputed that a jury found Plaintiff guilty of repeated annoying or harassing class in

violation of Penal Code § 653m(b). (DSUF No. 64).

   However, Defendants have not offered any developed legal argument that the criminal

complaint filed against Plaintiff, which charged Plaintiff for annoying phone calls and resisting

arrest, or Plaintiff's ultimate conviction for annoying phone calls, necessarily mean that the

deputies had probable cause, i.e., the reasonable belief that Plaintiff was guilty of a crime as

---

[22] The complaint originally charged Plaintiff with one count violation of Penal Code § 653x(a) (unlawful 911 calls), and three counts violation of Penal Code § 148(a) (misdemeanor resisting arrest). (PSAF No. 26). On November 1, 2018, the complaint was amended to replace the misdemeanor charge for unlawful 911 calls with a one count violation of Penal Code § 653m(b) (annoying telephone calls). (PSAF No. 27).

defined above, to conduct a warrantless arrest of Plaintiff at the time of Plaintiff's detention such to defeat Plaintiff's state law false imprisonment claims.

Defendants cite to *Blankenhorn*, 485 F.3d 463, in support of the proposition that Plaintiff's criminal charges and misdemeanor conviction necessarily mean that probable cause existed to arrest Plaintiff and so Plaintiff's state law false imprisonment claims are defeated as a matter of law on that basis. (ECF No. 157 at 9). In *Blankenhorn*, however, the Ninth Circuit extensively discussed whether, based on the undisputed facts and circumstances of the case, probable cause existed to arrest Blankenhorn for trespass, 485 F.3d at 471-475. After finding that probable cause existed to arrest Blankenhorn for trespass in reference to Blankenhorn's federal false arrest claim, the Ninth Circuit held that the arresting officers were entitled to summary judgment on Blankenhorn's state law imprisonment claim. *Id.* at 486 ("Because the arresting officers had probable cause to believe Blankenhorn was trespassing at The Block when he was arrested, we conclude that they were acting within the scope of their authority under California law and, therefore, that the arrest was lawful."). Although Blankenhorn was arrested for a suspected violation of misdemeanor trespass under one code section, but ultimately charged with misdemeanor trespass under a different code section, "[i]t [did not] matter [ ] if [Blankenhorn] was charged with a different crime than that for which he was arrested." *Id.* at 473. "As long as the officers had some reasonable basis to believe [Blankenhorn] had committed a crime, the arrest [is] justified as being [ ] based on probable cause." *Id.* (alterations in original) (quoting *Bingham v. City of Manhattan Beach*, 341 F.3d 939, 952 (9th Cir. 2003). Blankenhorn was also arrested for resisting arrest. 485 F.3d at 472. However, "[i]f there was no probable cause to arrest Blankenhorn for trespassing in the first place, it makes no difference [ ] if he resisted arrest." *Id.* (alterations in original) (quoting *Bingham*, 341 F.3d at 952). Thus, "[p]robable cause need only exist as to any offense that could be charged *under the circumstances*." *Id.* (emphasis added).

Here, Plaintiff has presented triable issues of fact as to whether Deputies Coldren, Dillon, Ceja, and Hernandez had probable cause, under the circumstances, to arrest Plaintiff based on any of the crimes cited by Defendants' motion.

First, it is undisputed that the phone calls to PPD were not made in the presence of the deputies. Accordingly, the deputies did not have probable cause to arrest Plaintiff without a

warrant for a misdemeanor violation related to the phone calls.[23] *See* Cal. Penal Code § 836 (a)(1).

Plaintiff was also cited with a misdemeanor charge for drunk and disorderly conduct (Cal. Penal Code. § 647(f)). (PSAF No. 24). The relevant penal code section provides that any one "[w]ho is found in any *public place* under the influence of intoxicating liquor, any drug, controlled substance, toluene, or any combination [of such substances] in a condition that they are unable to exercise care for their own safety or the safety of others, or by reason of being under the influence of [such substances] interference with or obstructs or prevents the free use of any street, sidewalk, or other public way." Cal. Penal Code. § 647(f) (emphasis added). Defendants have not cited to any law to support the assertion that probable cause exists to arrest an individual for *public* intoxication when that individual is on private residential property. Moreover, while it is undisputed that the deputies were aware that Plaintiff was possibly under the influence of alcohol and drugs, it is disputed whether Plaintiff was unable to exercise care for the safety of his parents.[24] Indeed, it is undisputed that the deputies never ordered or conducted any tests to determine Plaintiff's alcohol or drug levels. (DSAF No. 17). Plaintiff has also submitted evidence that suggests the deputies were aware they lacked probable cause to arrest Plaintiff for public intoxication. (PSAF No. 17 (citing Pl. Ex. 10, Smith Trial Testimony at 47: 1-4 ["Q: Sure. Would you agree with me that even if he was intoxicated, it was never in public? A: In the front yard of his house? Q: I agree it's not public."]).

Finally, Plaintiff has raised triable issues of fact as to whether the deputies had probable cause to arrest Plaintiff for elder abuse. In California,

> A person who knows or reasonably should know that a person is an elder or dependent adult and who, under circumstances or conditions other than those likely to produce great bodily harm or death, willfully causes or permits any elder or dependent adult to suffer, or inflicts thereon unjustifiable physical pain or mental suffering, or having the care or custody of any elder or dependent adult, willfully causes or permits the person or health of the elder or dependent adult to be injured or willfully causes or permits the elder or dependent adult to be placed in a situation in which his or her person or health may be endangered, is guilty of a misdemeanor.

---

[23] This does not mean, of course, that probable cause did not exist to ultimately *charge* Plaintiff with a misdemeanor violation for the phone calls based on some other evidence, such as the PPD phone records.

[24] Defendants do not assert that the deputies' believed Plaintiff was unable to care for himself or that Plaintiff was interfering with the free use of any public street or sidewalk.

Cal. Penal Code § 368(c). Felony elder abuse requires "circumstances or conditions likely to produce great bodily harm or death." Cal. Penal Code § 368(b)(1). Defendants assert that the deputies believed they had probable cause to arrest Plaintiff because they saw Plaintiff shove his mother several times. However, Plaintiff disputes Defendants' account of the interaction between himself and his parents. According to Plaintiff, he did not hit or push his mother or place his parents in harm's way. As discussed above, *see supra* pp. 13-15, the Court has found that a reasonable jury could adopt Plaintiff's version of events. Thus, it is a question for the jury as to whether the deputies had probable cause to arrest Plaintiff. *See Johnson*, 79 F.4th 996, 1006-07 (summary judgment not warranted on state law false arrest claims in light of genuine factual disputes necessary to probable cause determination).

Accordingly, Defendants' motion for summary judgment as to Plaintiff's third cause of action for state law false arrest claim is denied.

## III.   EMOTIONAL DISTRESS CLAIMS

### A.   Intentional Infliction of Emotional Distress

Plaintiff alleges that the deputies' intentional and outrageous conduct caused Plaintiff to suffer severe emotional distress. (ECF No. 22 at 10-11). Defendants argue they are entitled to summary judgment because Deputies Coldren, Dillon, Ceja, and Hernandez acted reasonably and because Plaintiff fails to demonstrate that he suffered emotional distress during the incident. (ECF No. 152 at 32-33).

Under California law, the tort of intentional infliction of emotional distress requires Defendants to have engaged in extreme and outrageous conduct with the intention to cause, or reckless disregard of the probability of causing, severe emotional distress. *Wong v. Tai Jing,* 189 Cal.App.4th 1354, 1375 (2010). A defendant's conduct is "outrageous" when it is "so extreme as to exceed all bounds of that usually tolerated in a civilized community." *Hughes v. Pair,* 46 Cal.4th 1035, 1050-51 (2009) (internal citations omitted). "[E]motional distress may consist of any highly unpleasant mental reaction such as fright, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment or worry." *Fletcher v. Western National Life Insurance Company* , 10 Cal.App.3d 376, 397 (1970). However, "the plaintiff must prove that emotional distress was *severe* and not trivial or transient." *Wong*, 189 Cal.App.4th at 1376 (emphasis in original).

"Severe emotional distress means emotional distress of such substantial quality or enduring quality that no reasonable [person] in civilized society should be expected to endure it." *Potter v. Firestone Tire & Rubbery Co.*, 6 Cal.4th 965, 1004 (1993).

This Court has found a triable issue of fact as to whether the Deputies Coldren, Dillon, Ceja, and Hernandez used unreasonable force when detaining Plaintiff. Viewing the facts in the light most favorable to Plaintiff, a reasonable jury could find that the surprise detention, and the use of impact blows, face punches, head kicks, pepper spray, and hobble ties, constituted extreme and outrageous conduct likely to cause severe emotional distress. *See Smith v. City of Marina*, No. 22-cv-07308-PCP, 2024 WL 34401, at *9 (N.D. Cal. Jan. 3, 2024) ("Allegations of excessive force can support a claim for intentional infliction of emotional distress."); *Lopez v. Chula Vista Police Dept.*, No. 07cv1272 WQH (BLM), 2009 WL 10725739, at *12 (S.D. Cal. June 22, 2009) (officers not entitled to summary judgment on emotional distress claims where same facts created triable issues as to excessive force claim); *see also Blankenhorn*, 485 F.3d, 487 n.17.

As to whether the deputies' conduct caused Plaintiff to suffer emotional distress, Plaintiff has testified that he suffers from paranoia and trouble sleeping following the incident. (PSAF No. 6 (citing to Pl. Ex. 1, Dep. of R. Huerta at 60:10-22). Plaintiff has also presented evidence of his diagnosis for "[t]raumatic brain injury secondary to assault," "[d]epressive disorder," and "[s]omatic symptom disorder (mood-exacerbated symptoms)."[25] (PSAF No. 20 (citing to Pl. Ex. 25, Centre for Neuro Skills Report at p. 2). Based on the evidence presented by Plaintiff, a reasonable jury could find that Plaintiff suffers from severe emotional distress that was caused by the deputies' actions. *See Thompson v. United States*, No. 12-cv-00302-JST, 2013 WL 4766846, at * 3 (N.D. Cal. Sep. 5, 2013) (plaintiff's testimony that "she suffers from a deteriorated mental state, fear or strangers, trembling at the sight of law enforcement, constant paranoia, and extreme sleep deprivation" following unreasonable search presents triable factual issue as to IIED claim).

Accordingly, Defendants' motion for summary judgment as to Plaintiff's fourth cause of action for intentional infliction of emotional distress under state law is denied.

---

[25] Defendants do not dispute, for purposes of summary judgment, that this report states that Plaintiff "had a primary/secondary diagnosis of '[t]raumatic brain injury secondary to assault.'" (DSAF No. 20).

**B.     Negligent Infliction of Emotional Distress**

Defendants argue that Plaintiff fails to establish that the deputies owed Plaintiff a duty of care regarding his emotional condition. (ECF No. 152 at 33). Plaintiff contends that, under California law, police officers have a duty to not use excessive force. (ECF No. 156 at 25).

In California, "there is no independent tort of negligent infliction of emotional distress ... [t]he tort is negligence." *Potter*, 6 Cal. 4th at 984; *see Wong*, 189 Cal. App. 4th at 1377 ("A claim of negligent infliction of emotional distress is not an independent tort but the tort of negligence to which the traditional elements of duty, breach of duty, causation, and damages apply.").

The California Supreme Court has allowed recovery for negligent infliction of emotional distress for "serious emotional distress ... [caused by] a breach of duty owed to the plaintiff that is 'assumed by the defendant or imposed on the defendant as a matter of law, or that arises out of a relationship between the two.'" *Burgess v. Superior Court,* 2 Cal.4th 1064, 1073 (1992). "Whether a defendant owes a duty of care is a question of law. Its existence depends upon the foreseeability of the risk and a weighing of policy considerations for and against imposition of liability." *Id.* at 1072 (quoting *Marlene F. v. Affiliated Psychiatric Medical Clinic, Inc.*, 48 Cal.3d 583, 588 (1989)).

Police officers owe no duty to individual members of the public by virtue of their office. *Williams v. California*, 664 P.2d 137, 140 n.3 (Cal. 1983). However, the Supreme Court of California "has long recognized that peace officers have a duty to act reasonably when using deadly force." *Hayes v. Cty. of San Diego*, 57 Cal.4th 622, 688 (2013). As Plaintiff has raised a triable issue as to whether the severity of the force exerted by Deputies Coldren, Dillon, Ceja, and Hernandez included deadly force, Plaintiff has also raised a triable issue as to whether or not the deputies owed a duty of care to Plaintiff to act reasonably when using such force.

Accordingly, Defendants' motion for summary judgment as to Plaintiff's twelfth cause of action for negligent infliction of emotional distress under state law is denied.

**IV.     NEGLIGENT HIRING, SUPERVISION, AND TRAINING CLAIMS**

Defendants next move for summary judgment of Plaintiff's ninth cause of action for negligent hiring and supervision and tenth cause of action for negligent training. Plaintiff alleges that TCSD employees or agents breached their duty of care to Plaintiff by hiring and supervising

individuals with a propensity to commit unlawful abuse. (ECF No. 22 at 17-18). Plaintiff further alleges that TCSD employees or agents breached their duty of care to Plaintiff by failing to take appropriate steps to train TCSD personnel to prevent unlawful abuse. (*Id.* at 18-20). Defendants argue the undisputed material facts are insufficient to establish a claim against TCSD based on the negligent hiring, supervision, and training of TCSD Deputy Defendants. (ECF No. 152 at 18-20).

Defendants are correct that any claims for direct liability against TCSD based on the negligent hiring, supervision and training of TCSD Deputy Defendants fail as a matter of law because there is no statutory basis for such liability. Cal. Gov. Code § 815 ("Except as otherwise provided by statute[,] [a] public entity is not liable for an injury[.]"); *de Villers v. Cty. of San Diego*, 156 Cal. App. 4th 238, 252 (2007) ("We find no relevant case law approving a claim for direct liability based on a public entity's allegedly negligent hiring and supervision practices."); *H.B. v. City of Torrance*, No. CV 17-02373 SJO (GJS), 2017 WL 10518108, at *4 (C.D. Cal. Aug. 16, 2017) (citing cases).

However, under California law, a public entity may be held vicariously liable for negligent hiring, supervision, and training by its employees. *C.A. v. William S. Hart Union*, 53 Cal. 4th 861, 865 (2012); *Est. of Osuna v. Cty. of Stanislaus*, 392 F.Supp.3d 1162, 1181-82 (E.D. Cal. 2019). To establish vicarious liability for negligent hiring, a plaintiff must establish that "supervisory and administrative" employees of the government entity "knew or had reason to know of [an employee]'s dangerous propensities and acted negligently in hiring, supervising and retaining [him or] her." *William S. Hart Union*, 53 Cal. 4th at 868-69. As in any action for negligence, the plaintiff must establish that the tortfeasor-employee had a duty of care to the victim, and that the breach of this duty caused the victim's harm. *Id.* at 876. "Absent such a special relationship, there can be no individual liability to third parties for negligent hiring, retention, or supervision of a fellow employee, and hence no vicarious liability under section 815.2."*Id.*

In opposition, Plaintiff generally argues that the hiring applications, training progression, and supervision of Deputies Ceja, Coldren, and Dillon "raised obvious red flags that should have been dealt with" by TCSD. (ECF No. 156 at 26). Although Plaintiff's SAC lists Does 7-50 under

his claims for negligent hiring, supervision, and training, Plaintiff fails to identify *any supervisor* who either knew or had reason to know of any Deputy Defendant's dangerous propensities and then acted negligently in hiring, supervising, or retaining him or her. Nor does Plaintiff identify any supervisor who negligently trained any TCSD Deputy Defendant. More importantly, "California law does not recognize a general duty of care on the part of supervisors with respect to negligent hiring, retention, or training." *Est. of Osuna*, 392 F.Supp.3d at 1182.

Accordingly, TCSD is entitled to summary judgment on Plaintiff's ninth cause of action for negligent hiring and supervision and tenth cause of action for negligent training.

## V.     BANE ACT

Plaintiff seeks attorney fees and damages under the Bane Act based on his allegations that Defendants violated his Fourth Amendment rights. Defendants argue there is no evidence that shows Deputies Coldren, Dillon, Ceja, and Hernandez acted with specific intent to deprive Plaintiff of his constitutional rights. (ECF No. 152 at 31-32). Although Defendants argue that the "the only evidence in this case on point is that they believed they were acting within the limits of the Constitution," Defendants do not explain what that evidence is or cite to any undisputed fact. (ECF No. 152 at 32).

As Plaintiff argues, there are several facts that could demonstrate that Deputies Coldren, Dillon, Ceja, and Hernandez were motivated by an evil intent to violate Plaintiff's Fourth Amendment rights. (ECF No. 156 at 30). Plaintiff contends the deputies were angry with Plaintiff because he "was disrespectful towards them" and decided to detain Plaintiff by surprise in a "got-ya tactic." (*Id.*) According to Plaintiff, Deputies Coldren, Dillon, and Hernandez purposefully turned off their body worn cameras with the intent not to capture any footage of the surprise detention and the force used. (*Id.*)

In reply, Defendants reiterate that Plaintiff fails to cite to any evidence that "Defendant Deputies must have had a particular intent or reckless disregard beyond their uses of force during the incident[.]" (ECF No. 157 at 9).

### A.     Bane Act Legal Standards

The Bane Act provides a right of action to "[a]ny individual whose exercise or enjoyment of rights secured by the Constitution or laws of the United States, or of rights secured by the

Constitution or laws of [California] has been interfered with" by another person's "threats, intimidation, or coercion." Cal. Civ. Code § 52.1(b)–(c).

The elements of a Bane Act claim are essentially identical to the elements of a § 1983 claim, with the added requirement that the government official had a "specific intent to violate" a constitutional right. *Hughes v. Rodriguez*, 31 F.4th 1211, 1224 (9th Cir. 2022) (citing *Reese v. Cty. of Sacramento*, 888 F.3d 1030, 1043 (9th Cir. 2018)); *Reese*, 888 F.3d at 1043 ("[T]he Bane Act requires a specific intent to violate the arrestee's right to freedom from unreasonable seizure.") (citing *Cornell v. City & Cty. of San Francisco*, 17 Cal. App. 5th 766, 801 (2017)). A plaintiff bringing a claim under the Bane Act relating to an excessive force claim must show that the officer "intended not only the force, but its unreasonableness, its character as more than necessary under the circumstances." *Id.* at 1045 (quoting *United States v. Reese*, 2 F.3d 870, 885 (9th Cir. 1993)). This does not require a showing that a defendant knew he was acting unlawfully; "[r]eckless disregard of the 'right at issue' is all that [i]s necessary." *Cornell*, 17 Cal. App. 5th 766 at 804.

A municipal entity may be held vicariously liable under the Bane Act. *See* Cal. Gov. Code § 815.2(a); *Cameron v. Craig*, 713 F.3d 1012, 1023-24 (9th Cir. 1013) ("California, however, has rejected the *Monell* rule and imposes liability on [municipalities] under the doctrine of respondeat superior for acts of [municipal] employees.").

**B.    Bane Act Discussion**

Here, Plaintiff presents a genuine dispute as to whether Deputies Dillon, Ceja, and Hernandez were aware of Sergeant Smith's plan to detain Plaintiff by surprise. Plaintiff cites to the crime report prepared by Deputy Dillon, which states:

> Deputies stepped away from the front of the residence and stood at the sidewalk, while Deputy Coldren positioned himself on the side in a manner which concealed him from Huerta should he step outside and shout profanities towards myself and other deputies. *I continued to engage with Huerta while he was shouting profanities in order to maintain attention onto myself and the deputies near me*, and Huerta stepped outside.

(PSUF No. 39 (citing Pl. Ex. 11, Crime Report by J. Dillon at lines 53-58)) (emphasis added). Plaintiff also cites to Deputy Coldren's crime report, which states that "[i]t was determined a ruse was going to be used and Deputies were advised to 'leave' the residence." (*Id.*, (citing Pl. Ex. 11,

Crime Report by M. Coldren at lines 171-173)) (quotation marks in original). In an email sent at

4:20 am on April 26, 2017, Sergeant Smith describes the "ruse" as follows:

> This was bordering on elder abuse in which I was not going to leave the drunk at this house as mad as he was at the world. I tried talking him out—negative results. I planned it to[o] well because I told other deputies present we would just leave so they turned off body cameras. I had no plan to leave and had Coldren enter through other gate and he was within 6-8 feet of the front door. There were a lot of plants which hid Coldren and the male was so angry he opened [the] door to walk outside to continue yelling at us. *I told deputies to be prepared as they were at the roadway* and Coldren caught male outside and deputies rushed in to help.

(PSUF No. 39 (citing to Pl. Ex. 12, R. Smith Email)) (emphasis added). Although Deputies

Dillon and Hernandez testified that they were not aware of Sergeant Smith's plan, Deputy Ceja

testified that he "watch[ed] them go to the side and [he] kind of figured [he] knew what they were

gonna do." (Def. Ex. X, Dep. of S. Ceja at 54:5-13; Def. Ex. U, Dep. of J. Dillon at 73:1-3; Def.

Ex. T, Dep. of H. Hernandez at 65:21-22). While perhaps not determinative to the issue of intent,

when viewing the above facts in the light most favorable to Plaintiff, a reasonable jury could find

that all deputies present at the scene were not only aware of the plan to physically detain Plaintiff

by surprise, but specifically intended to participate in a surprise detention that was unreasonable

and unjustified, thus violating Plaintiff's constitutional rights.

Further, it is undisputed that Deputy Coldren instructed the other deputies that, "[i]f [the

front] door opens, do not rush him, but we are going to take him out…I just want that door to be

able to swing." (PSUF No. 28) (citing Defs. Ex. B at 05:48-06:04). A reasonable jury could find

that this statement indicates that the deputies arrived at Plaintiff's house with the specific intent to

unlawfully harass Plaintiff because of his calls to PPD.

Plaintiff also submits evidence that creates a triable issue as to whether Deputies Coldren,

Dillon, and Hernandez purposefully turned off their body worn cameras so the incident would not

be caught on video at the direction of Sergeant Smith.[26] (PSAF Nos. 11-13). Plaintiff points to an

undisputed conversation between Deputy Dillon and Deputy Coldren captured by Deputy

---

[26] Defendants assert that Deputy Coldren's body worn camera cord broke *during* the physical altercation with Plaintiff. (DSUF No. 42). However, Plaintiff points out that the video footage of Deputy Coldren's body worn camera submitted by Defendant does not include any part of Deputy Coldren's initial attempt to detain Plaintiff outside the residence or the subsequent physical altercation between the deputies and Plaintiff. (PSUF No. 42). Accordingly, the Court finds a dispute of fact whether Deputy Coldren intentionally turned off his body worn camera.

Dillon's bodycam that suggests the deputies did not want video feed of the incident. (PSAF No. 12) (citing to Def. Ex. F at 1:20-1:25 ["Coldren: No Feed? Dillon: Yes, Sir."]). Plaintiff also points to trial testimony by retired TCSD sergeant, Jerry Mayberry, from Plaintiff's state criminal trial that Deputy Coldren indicated to Sergeant Mayberry during a conversation about the incident that the deputies were told to turn off their body cameras, and it was Sergeant Mayberry's understanding that Sergeant Smith gave the order.[27] (PSAF No. 35 (citing Pl. Ex. 9 at 129:23-131:13, 132:11-133:18)). Viewing the disputed evidence in favor of Plaintiff, a reasonable jury could find that Deputies Coldren, Dillon, and Hernandez turned off their body worn cameras with the specific intent of concealing the deputies' unlawful conduct.

And as discussed above, there are several outstanding material disputes regarding the reasonableness of the force employed by Deputies Coldren, Dillon, Ceja, and Hernandez under the circumstances. When drawing all reasonable inferences in favor of Plaintiff, a reasonable jury could find that Deputies Coldren, Dillon, Ceja, and Hernandez acted unreasonably and with reckless disregard for Plaintiff's rights under the Fourth Amendment by pinning Plaintiff to the ground in a surprise detention, delivering multiple impact blows and face punches, kicking Plaintiff in the head, pepper spraying and hobble-tying Plaintiff after he was handcuffed. *See Hughes*, 31 F.4th at 1224 ("Whether [defendant] used excessive force in violation of Hughes's constitutional right, and whether he had a specific intent to do so, are questions properly reserved for the trier of fact."); *see also Tucker v. City of Elk Grove*, No. 2:20-cv-01620-DAD-KJN, 2023 WL 4827470, at * 13 (E.D. Cal. June 27, 2023) ("The court has concluded that, viewing the evidence in the light most favorable to plaintiff, a reasonable juror could conclude that the defendant officers acted unreasonably under the Fourth Amendment when they shot plaintiff. From this same evidence, a reasonable juror could conclude that the defendant officers acted in reckless disregard for plaintiff's rights.") (citing cases).

---

[27] Defendants object to Plaintiff's submission of this testimony into evidence on the grounds that Sergeant Mayberry's testimony is improper hearsay, speculative, lacks foundation, and irrelevant. (ECF No. 1571-2 at 2). The Court will overrule Defendants' objections to this evidence for purposes of summary judgment. Sergeant Mayberry's testimony may be presented in a form admissible at trial as an opposing party statement. Fed. R. Evid. 801(d)(2)(A)-(B) (A statement is non-hearsay "if offered against an opposing party and was made by the party in an individual or representative capacity. . ."). Further, whether or not the deputies' body worn cameras were intentionally turned off is highly relevant to Plaintiff's Bane Act claim. Fed. R. Evid. 401.

Accordingly, Defendants' motion for summary judgment as to Plaintiff's seventh cause of action for violations of the Bane Act is denied.

**PUNITIVE DAMAGES**

Plaintiff seeks punitive damages under federal and state law. Defendants contend that Plaintiff has presented no evidence TCSD Deputy Defendants "acted with evil intent." (ECF No. 152 at 35). Further, Defendants contend TCSD is entitled to summary judgment because public entities cannot be held liable for punitive damages. (*Id.*)

Punitive damages may be awarded in a § 1983 action "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Dang v. Cross*, 422 F.3d 800, 807 (9th Cir. 2005) (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1986)). A § 1983 punitive damages claim is subject to summary adjudication "where plaintiff fails to produce evidence raising a material question of fact regarding aggravating circumstances or the reckless or callous nature of defendant's actions." *S.T. by and through Niblett v. City of Ceres*, 327 F.Supp.3d 1261, 1283 (E.D. Cal. 2018) (internal citations omitted). Under California law, punitive damages may be awarded if plaintiff establishes "by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice." Cal. Civ. Code § 3294(a).

Defendants are correct that TCSD, as a public entity, cannot be held liable for punitive damages under both federal and state law. *See City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981) ("[A] municipality is immune from punitive damages under 42 U.S.C. § 1983."); Cal. Gov. Code § 818 ("[A] public entity is not liable for [exemplary damages] or other damages imposed primarily for the sake of example and by way of punishing the defendant.").

However, as discussed above, Plaintiff has raised triable issues of fact that as to whether Sergeant Smith acted in reckless disregard of Plaintiff's rights when he orchestrated the ruse to detain Plaintiff, and whether Deputies Coldren, Dillon, Ceja, and Hernandez acted in reckless disregard of Plaintiff's rights in the force used to detain Plaintiff, which included the surprise take-down maneuver, baton and flashlight strikes, face punches, and head kicks. Viewing these disputed facts in the light most favorable to Plaintiff, a reasonable juror could conclude that one or more TCSD Deputy Defendants acted with reckless disregard or malice as to Plaintiff's rights.

*See Lopez*, 2009 WL 10725739, at *16 (denying summary judgment as to punitive damages for the same reasons officers were not entitled to summary judgment on excessive force and related state law claims).

Accordingly, Defendants' motion for summary judgement as to punitive damages is granted as to TCSD only and otherwise denied.

## CONCLUSION AND ORDER

Based on the foregoing, IT IS ORDERED that Defendants' motion for summary judgment (ECF No. 152) is, GRANTED IN PART and DENIED IN PART, as follows:

1. Summary judgment is GRANTED in favor of Defendant Laura Torres-Salcido on all causes of action to the extent such claims are asserted against her.

2. Summary judgment as to Plaintiff's first cause of action for assault is DENIED.

3. Summary judgment as to Plaintiff's second cause of action for battery is DENIED.

4. Summary judgment as Plaintiff's third cause of action for false imprisonment is DENIED.

5. Summary judgment as to Plaintiff's fourth cause of action for intentional infliction of emotional distress is DENIED.

6. Summary judgment is GRANTED in favor of all defendants to the extent that Plaintiff's fifth cause of action for violation of civil rights pursuant to 42 U.S.C. § 1983 is based on Plaintiff's allegations that he was denied adequate medical care.

7. Summary judgment is GRANTED in favor of Tulare County Sheriff's Department only to the extent that Plaintiffs fifth cause of action for violation of civil rights pursuant to 42 U.S.C. § 1983 is based on Plaintiff's excessive force allegations and otherwise DENIED as to Plaintiff's excessive force claims against Defendants Ronald Smith, Michael Coldren, James Dillon, Hector Hernandez, and Salvador Ceja.

8. Summary judgment as to Plaintiff's sixth cause of action for violation of civil rights under *Monell*, 436 U.S. 658 (1978) is GRANTED.

9. Summary judgment as to Plaintiff's seventh cause of action for violation of California's Bane Act is DENIED.

10. Summary judgment as to Plaintiff's eighth cause of action for violation of California's Unruh Act is GRANTED.

11. Summary judgment as to Plaintiff's ninth cause of action for negligent hiring and supervision is GRANTED in favor of Tulare County Sheriff's Department only.

12. Summary judgment as to Plaintiff's tenth cause of action for negligent training is GRANTED in favor of Tulare County Sheriff's Department only.

13. Summary judgment as to Plaintiff's eleventh cause of action for violation of the First Amendment is GRANTED.

14. Summary judgment as to Plaintiff's twelfth cause of action for negligent infliction of emotional distress is DENIED.

15. Summary judgments as to Plaintiff's claim for state and federal punitive damages is GRANTED in favor of Tulare County Sheriff's Department only, and otherwise DENIED as to Defendants Ronald Smith, Michael Coldren, James Dillon, Hector Hernandez, and Salvador Ceja.

IT IS SO ORDERED.

Dated:   **February 28, 2024**         /s/ _Erica P. Grosjean_

UNITED STATES MAGISTRATE JUDGE